[No. 25551. Department Two. July 1, 1935.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES WILSON, *Appellant*.[1]

[1]Reported in 47 P. (2d) 21.

320

*Fix & Clifford,* for appellant.

*Warren G. Magnuson* and *Frank Harrington,* for respondent.

MITCHELL, J.—Charles Wilson was charged in count I of an information with the unlawful possession of 31.20 grains of morphine with intent to sell and dispose of the same, and in count II with the crime of unlawfully acquiring the 31.20 grains of morphine.

At the close of all the evidence, the court granted defendant's motion for a directed verdict as to count II and denied his motion for a directed verdict as to count I. The jury found defendant guilty as to count I. Judgment was entered on the verdict, from which the appeal has been taken.

Appellant was a morphine addict of many years' standing, not under restraint. He procured the morphine in question in this prosecution on the prescription of a physician who had been giving him prescriptions for approximately a year. At first, the amount prescribed "was about enough so that he would have about four grains daily." The quantity was thereafter increased until, for the last six months, the physician gave weekly prescriptions of about 150 half-grain tablets, about ten grains per day, the last prescription being given four days before the appellant was arrested.

Upon being arrested, the appellant was confined in the city jail five days. The jail physician testified that,

upon learning appellant was an addict, he gave him ¾ grain of morphine the first day, half a grain the next day, ⅜ grain the next day, ¼ grain the next day, and ⅙ grain the next day; and further testified:

"Q. Do you know whether or not he seemed to get along on that ration of the drug or not, Doctor? A. Very nicely."

Appellant was suspected by the police of being a peddler of narcotics, and to get evidence against him the police had the assistance of a drug addict named McGill, who was a customer of appellant and who testified that usually each night for the last month he had bought three one-half grain tablets from the appellant.

The arrest occurred about 11:30 o'clock at night at a place on the street where the appellant frequently delivered the drug to McGill. The arrest was made by Policemen E. R. Shirran and N. P. Anderson. Shirran's account of the arrest was as follows:

"Q. Have you ever seen the defendant, Charles Wilson, before? A. Oh, I have seen Charlie around here for a long time. Q. Did you see Charlie on January 27th of this year up on Pike Street? A. Yes, on Sixth and Pike. Q. What was Charlie doing when you saw him? A. Well, he came down the street and walked across and talked to some people in a car that was double parked on the west side of Sixth Avenue. Then he came down and talked to McGill, who was standing down just a little way from Anderson. Anderson and I were about fifteen feet away on the west side of Sixth, and he came over and talked to McGill, and talked to him there for about a minute, and finally he seen Anderson and he had this finger-stall in his hand so he threw the finger-stall and Anderson grabbed him and picked it up and he started kicking and we took him down to the station. Q. When you say, 'The finger-stall' you are referring to State's '1' for identification? A. Yes, that is it, just the way it was. Q. And how many tablets were in there, if you know? A. I

think there was 56 half-grain tablets. Q. They are half-grain tablets? A. Yes. Q. How far was the finger-stall from the defendant Wilson at the time that you picked it up? A. Oh, it wasn't very far, he kicked me in the arm. Q. Kicked you as you tried to pick it up? A. Yes.''

There was other testimony tending to show the same facts. A chemist who analyzed the drug testified that the finger-stall contained 31.20 grains of morphine.

Appellant testified that, after the prescription was filled, he transferred the morphine from a box containing the tablets to a finger-stall, saying: ''I always carry my drugs in a rubber finger-stall, for it is more convenient and keeps them fresher.''

The statute involved is Rem. Rev. Stat., § 2509-3 [P. C. § 4071-3]. The first part of the section makes it plain that the legislature intended that the possession of narcotics for sale and disposition should be restricted to a selected class, and that the distribution by such privileged persons should be carefully supervised and safeguarded

''. . . upon the written and signed prescription of a physician regularly licensed to practice medicine and surgery who has complied with the regulations of, and is duly registered under the laws of the state of Washington, and the laws of the Congress of the United States.''

This section further provides:

''It shall be deemed a violation of this act for any person to have in his or her possession any narcotic drug, or any preparation or compound containing same in unexempt quantities, unless the same shall have been obtained pursuant to this act and to the laws of the Congress of the United States and the rules and regulations now in force or hereafter promulgated thereunder, and proof of the possession of any such narcotic drug, except by a licensed physician, licensed manufacturer or licensed druggist, shall be prima facie

evidence of an intent to unlawfully sell, furnish or dispose of the same.''

The first assignment is that error was committed in denying appellant's motion for a directed verdict of not guilty as to count I. The argument is that, as count II—unlawfully acquiring the drug—was dismissed by the court because the drug was procured upon a physician's prescription, therefore count I failed. We are not persuaded by the argument. If an addict who may get along ''nicely'' on ¾ grain or less of the drug, daily, may lawfully, and without incriminating inferences and implications, procure morphine upon prescriptions to the extent of ten grains per day, continuously, then he may with equal ease and safety have ten or more times ten grains per day. If, pursuant to this act and ''the laws of the Congress of the United States and the rules and regulations now in force or hereafter promulgated thereunder,'' physicians can prescribe so that another, not under restraint, may receive narcotic drugs in large and excessive quantities, regardless of the fact whether it is done in good faith for the relief of a patient, then the moral object and purpose of the act are entirely defeated. It was so held in *Thompson v. United States*, 258 Fed. 196, wherein the circuit court of appeals said:

''It certainly cannot be claimed that a physician selling these narcotics, not in good faith, for the purpose of securing a cure of one suffering from an illness, or to cure him from the morphine habit, is doing so 'in the course of his professional practice only,' as prescribed by the express language of the act.''

The same reasoning applies to the conduct of the other person to the transaction, that is, the one who receives the prescription and has it filled. In all such cases, the determination of good faith is a question for the jury, following the principle laid down in *Hoyt v.*

*United States*, 273 Fed. 792; *Teter v. United States*, 12 Fed. (2d) 224.

Under this rule, there was abundant evidence to take the case to the jury upon count I, whether or not error was committed in the dismissal of count II.

Besides, and considered in simple fashion, the evidence was sufficient to satisfy the jury that, as a matter of fact, the appellant did have morphine in his possession with intent to sell and dispose of it.

The second assignment is that, in cross-examining the appellant's witness, the physician who gave the prescription, the state was allowed to go beyond the scope of the examination in chief. The whole purpose of the examination in chief was an attempt to show the legitimacy of the practice in giving the prescriptions, and the cross-examination was well within that scope.

Another assignment is that the court erred in allowing the state to cross-examine appellant's physician as to the physical condition of the appellant at the time the prescription was given, the claim being that the information thus obtained was privileged. Surely, however, there can be no good faith or reason in prescribing narcotics unless some physical trouble is to be remedied. When, therefore, the appellant called his physician to testify with respect to the prescriptions, he necessarily waived the privilege and made it proper for the state to cross-examine on that subject.

The final assignments 4 and 5 charge error in allowing the state, in rebuttal, to introduce expert evidence as to the proper medical practice in the case of a narcotic addict in the general condition of the appellant. This evidence in rebuttal did not reasonably appear to be necessary or proper until, after convincing proof against the appellant of his constant and

habitual procuring of greatly excessive quantities of narcotic drugs, he attempted to defend on the good faith of prescriptions written by a physician. The admission of this rebuttal testimony, whether viewed from the standpoint of being discretional with the trial court or otherwise, was proper and followed the practice and order of trial that was approved in *State v. Bailey*, 147 Wash. 411, 266 Pac. 163, and authorities therein cited.

Judgment affirmed.

MILLARD, C. J., HOLCOMB, STEINERT, and BLAKE, JJ., concur.

